**In re Roy A. LAUES, SS#: 433–33–8695, Rhonda A. Laues, SS#: 375–90–2453, Debtors.**

**Bankruptcy No. 88–00995–SN3.**

United States Bankruptcy Court, E.D. North Carolina.

Sept. 14, 1988.

---

Kenneth E. Banks, Fayetteville, N.C., for debtors.

Christopher B. Godwin, Fayetteville, N.C., for Fort Bragg.

Carol A. Morrison, Fayetteville, N.C., for trustee.

## MEMORANDUM OPINION AND ORDER

A. THOMAS SMALL, Bankruptcy Judge.

The matter before the court is the "Motion to Turnover Funds" filed by the chapter 7 debtors on June 20, 1988, which seeks an order requiring Fort Bragg Federal Credit Union ("Credit Union") to turnover to the debtors $430 [1] representing wages which had been directly deposited by the male debtor's employer into the debtors' Credit Union checking account. The Credit Union filed an objection to the debtors' motion on July 1, 1988, and a hearing was held in Raleigh, North Carolina, on August 29, 1988.

The parties have stipulated to the relevant facts. The debtors had taken out a prepetition loan from the Credit Union which was secured by the debtors' 1987 Nissan Sentra. (The debtors' schedule of creditors states that the amount of the Credit Union's claim is $6,477.15 and that the market value of the Sentra is $5,000.) The loan agreement provided that the debtors pledged as security all present or future deposits in the debtors' Credit Union account and that the Credit Union had the right to apply those deposits to what was owed on the loan if there was a default on the loan. [2]

---

**1.** The debtors' written motion states that the amount in question is $470, but the debtors' attorney indicated at the hearing, without reference to any discrepancy in the written motion, that the amount in question was $430. To further confuse the matter, the debtors' schedules reflect a balance in the account of $365. The court will use the figure which counsel seemed to agree at the hearing is correct—$430.

**2.** The loan agreement was never introduced into evidence. However, in presenting the stipulated facts, the attorney for the Credit Union stated that the exact language was that "you [the debt-

On the morning of April 29, 1988, the Credit Union accelerated the debt and repossessed the debtors' automobile based on the fact that the debtors had no insurance on the automobile. That same morning, the Credit Union "froze" the debtors' checking account, the balance of which included the proceeds of a wage check which had been deposited by direct deposit from the male debtor's employer. The debtors filed for relief under chapter 7 of the Bankruptcy Code later that same day. The debtors were formally notified by certified mail on May 2, 1988, that a freeze on their checking account had been placed in effect at 8:20 a.m. on April 29, 1988. The debtors had notified the Credit Union of their bankruptcy filing on April 29, 1988, after the freeze had been placed in effect.

On June 15, 1988, the chapter 7 trustee filed a report stating that there is no property available for distribution from the debtors' estate above that exempted by the debtors. The debtors have claimed their wages as exempt pursuant to N.C. GEN. STAT. § 1–362 and their deposits as exempt pursuant to N.C. GEN.STAT. § 1C–1601(a)(2).[3] The bar date for filing objections to the debtors' exemptions was July 11, 1988, and no objections to the debtors' exemptions have been filed. Wages deposited postpetition into the debtors' checking account have been turned over to the debtors.

This proceeding presents several issues for resolution.[4] First, the court must determine if the chapter 7 debtors' exemption rights with respect to funds which were deposited in the Credit Union account are superior to the Credit Union's right to set-off the account against debts owed to the Credit Union by the debtors. If so, the court must then decide whether the Credit Union has created a valid security interest in the debtors' account which would be prior to the debtors' exemptions. The answer to the first question is yes; the answer to the second question is no.

*Relationship Between Setoff and Exemptions*

Whether the debtors' exemption rights or the Credit Union's right of setoff has priority, in the circumstances of this case, will be determined by the law of the State of North Carolina. Bankruptcy Code § 553 provides that, with some exceptions not applicable here and subject to the automatic stay, a creditor's right of setoff is not affected by a debtor's bankruptcy. The setoff right asserted by the Credit Union is the common law right of setoff recognized in North Carolina. The exemptions asserted by the debtors are claimed under and will be determined by North Carolina law as well.[5]

The debtors' deposit balance with the Credit Union may be claimed as exempt by the debtors under either N.C.GEN.STAT. § 1C–1601(a)(2)[6] or N.C.GEN.STAT.

---

or] also pledge as security for what you owe all present and future shares and/or deposits in your individual or joint Credit Union accounts. The Credit Union has the right to apply your present and future shares or deposits towards the amount you owe if you are in default." The attorney for the debtors did not dispute this description of the loan agreement.

**3.** The debtors' "Schedule B–4 Claim of Exemptions" claims as exempt the $365 deposit noted in footnote 1 pursuant to N.C.GEN.STAT. § 1C–1601(a)(2), but no reference to this section was made by the debtors' attorney at the hearing held on August 29.

**4.** One issue that is not presented is whether the placing of a "freeze" on a debtor's checking account causes a violation of the automatic stay. In this case the "freeze" took place prior to the filing of the bankruptcy petition and the debtors' motion does not contend that the stay was

violated. The debtors' motion also does not claim that all or part of the "freeze" constitutes an avoidable "improvement of position" pursuant to 11 U.S.C. § 553(b) and the court need not determine whether a prepetition "freeze" constitutes a setoff for purposes of § 553(b).

**5.** North Carolina, as authorized by 11 U.S.C. § 522(b)(1), "opted" out of the bankruptcy exemptions provided by 11 U.S.C. § 522(d). N.C. GEN.STAT. § 1C–1601(f).

**6.** N.C.GEN.STAT. § 1C–1601(a)(2) is known as the "wild card" exemption and allows the debtor to exempt "[t]he debtor's aggregate interest in any property, not to exceed two thousand five hundred dollars ($2,500) in value less any amount of the exemption used under subdivision (1)." In this case the debtors did not claim an exemption for a residence under N.C.GEN. STAT. § 1C–1601(a)(1) and would be entitled to claim any property as exempt up to $2,500.

§ 1–362.[7] There are very few reported cases which discuss either of these exemption statutes, but the general rule is that North Carolina's exemption laws are to be liberally construed in favor of the exemption. *Elmwood v. Elmwood,* 295 N.C. 168, 185, 244 S.E.2d 668 (1978); *In re Mims,* 49 B.R. 283 (Bankr.E.D.N.C.1985).

A bankruptcy court which recently considered this issue concluded that an overwhelming majority of state court decisions prohibit a creditor from offsetting obligations owed against statutorily exempt property and that bankruptcy courts "have generally followed this direction and have not allowed setoff against property otherwise unreachable by creditors under the Code." *In re Wilde,* 85 B.R. 147, 148 (Bankr.D.N.M.1988). The reasoning behind this majority rule, which was adopted in *Wilde,* is convincing and will be followed by this court in this proceeding.[8]

*Security Interest in Checking Account*

■ As a general proposition, a debtor may not use an exemption to defeat a valid contractual security interest. *Montford v. Grohman,* 36 N.C.App. 733, 245 S.E.2d 219, *appeal dismissed,* 295 N.C. 551, 248 S.E.2d 727 (1978); N.C.GEN.STAT. § 1C–1601(e)(7); 11 U.S.C. § 552(c). There is an exception to that general rule provided by N.C.GEN.STAT. § 1C–1601(e)(7) with respect to nonpossessory, nonpurchase money security interests in household goods, but that exception is not applicable here.[9]

The Credit Union contends that it has a valid security interest in the debtors' account by virtue of broad language in the loan documents by which the debtors pledged to the Credit Union all deposits in their checking account with the Credit Union as security for the automobile loan.

A transfer of a deposit account is specifically excluded from Article 9 of the Uniform Commercial Code, N.C.GEN.STAT. § 25–9–104(*l*); B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 1.8[12], at 1–75 (1980), and there is no North Carolina statute which addresses the pledge of a bank account by a depositor to the depository bank as collateral for the bank's loan to the depositor. The court then must look to the common law of North Carolina to determine the validity of the Credit Union's security interest in the debtors' account. The Credit Union has produced no North Carolina cases which support the validity of their lien on the account.

The relationship between the Credit Union and the debtors regarding the checking account is that of debtor/creditor, and it is difficult to comprehend how a loan from the Credit Union can be secured by a debt which the Credit Union owes. Pledges are recognized under the North Carolina common law, but a pledge "is a deposit of personal effects, not to be taken back, but on payment of a certain sum, by express stipulation, to be a lien upon it." *Doak v. Bank of State,* 28 N.C. 309, 319, 6 Ired. 309

---

7. N.C.GEN.STAT. § 1–362 may be used to exempt wages needed for support of the family. In this case it is not disputed that the deposit account represents wages needed for the debtors' support. § 1–362 provides:

The court or judge may order any property, whether subject or not to be sold under execution (except the homestead and personal property exemptions of the judgment debtor), in the hands of the judgment debtor or of any other person, or due to the judgment debtor, to be applied towards the satisfaction of the judgment; except that the earnings of the debtor for his personal services, at any time within 60 days next preceding the order, cannot be so applied when it appears, by the debtor's affidavit or otherwise, that these earnings are necessary for the use of a family supported wholly or partly by his labor.

8. The issue of what happens when, prebankruptcy, a credit union or bank offsets against an account containing funds which potentially could be claimed as exempt is not before the court. That is an entirely different question from those before the court and involves other considerations. "As a policy matter, the bank is frequently without knowledge of the source of deposits, and it would be a huge practical burden to determine which funds were subject to setoff and which were not." B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 11.4, at 11–10 (rev. ed. 1981).

9. Also not applicable is 11 U.S.C. § 522(f)(2) which permits the avoidance of a nonpossessory, nonpurchase money security interest in certain types of personal property to the extent that the lien impairs an exemption.

(1846). The Credit Union does not hold the deposit as bailee of the debtor, but as the debtor's account debtor.

What the Credit Union has is the right of setoff which, as already determined, is subject to the chapter 7 debtors' exemption rights. A claim that is subject to setoff is treated as a secured claim to the extent of the amount subject to setoff, but it is treated as secured *only to that extent*. 11 U.S.C. § 506(a). In this case the full deposit is exempt and under § 506(a) the claim of the Credit Union, after deducting the value of the automobile, is unsecured. *In re Pieri*, 86 B.R. 208 (Bankr. 9th Cir.1988).

■ Although the broad language in the loan documents which purports to grant a security interest in the account does not do so, does that language constitute a waiver of the debtors' exemptions? Clearly it does not, either under North Carolina exemption law or the provisions of the Bankruptcy Code. N.C.GEN.STAT. § 1C–1601 (c); 11 U.S.C. § 522(e).

*Turnover*

■ The debtors' motion for turnover does not identify the section of the Bankruptcy Code which requires the turnover by the Credit Union. 11 U.S.C. § 542(a) requires an entity in possession, custody or control of property which the debtor may exempt to deliver the property to the trustee. 11 U.S.C. § 542(b) requires an entity which "owes a debt that is property of the estate" to pay the debt to the trustee.[10] Sections 542(a) and (b) could possibly be interpreted to be inapplicable to the present situation. Section 542(a) refers to the turnover of "property" and not to the payment of a debt. Section 542(b) refers to the payment of a debt, but only the payment of a debt that is property of the estate. What we have in this proceeding is the request for the payment by the Credit Union of a debt which, because it is exempt, is not property of the estate. If § 542 does not apply, the court certainly has ample authority to require the payment to the debtors of

the account balance pursuant to 11 U.S.C. § 105(a).

*Summary and Conclusion*

■ The debtors have exempted the account balance in their checking account with the Credit Union and the debtors' exemption rights are superior to the Credit Union's right of setoff. Furthermore, the Credit Union has no security interest in the deposit account and the debtors have not waived their exemption rights. Based on the foregoing, the debtors are entitled to have the account balance paid to them and the Credit Union shall make the account balance immediately available to the debtors.

SO ORDERED.

---

10. 11 U.S.C. § 542(b) provides that the account debtor need not pay the debt to the trustee "to the extent that such debt may be offset" under

§ 553. The court has already determined that the debtors' exemption rights preclude an offset in this case.